## S98A0341. ADAMS v. THE STATE.
### (498 SE2d 268)

THOMPSON, Justice.

In this case of first impression, we are called upon to decide the facial validity of OCGA § 17-10-15 (b).[1] That statute permits the victim of a crime involving significant exposure to HIV to request that the person arrested for the crime submit to an HIV blood test. If the person arrested refuses to submit to such a test, the statute enables the judge of the superior court in which the charge is pending to order one. Appellant challenges the statute on Fourth Amendment, right of privacy, and equal protection grounds. We reject appellant's challenges and uphold the constitutionality of the statute.

### The Facts and Procedural History

On October 3, 1997, Detective Mark Woods and Officer Larry Hill of the Waycross Police Department attempted to arrest appellant in a store. When the officers approached appellant, he attacked them and a struggle ensued. Appellant had a bandage on his hand, and blood was seeping through it. Woods' fingers were cut during the course of the struggle, and he was bleeding, too.

Although, outwardly, appellant exhibited no signs of having contracted AIDS, the State filed a motion to compel him to submit to an HIV test pursuant to OCGA § 17-10-15 (b). At a hearing held in superior court pursuant to that statute, Woods testified that appellant's wounded hand and his own cut fingers touched each other and that, although he could not be 100 percent certain, it was "possible" that appellant's blood came into contact with his own.

The superior court granted the State's motion to compel an HIV test. Appellant's request for a stay pending appeal was denied and he was tested for HIV.[2] This appeal followed.

### Testing for HIV

Recent cases and legal literature[3] concerned with HIV testing refer primarily to two tests which are used to determine whether a person has HIV — the enzyme-linked immunosorbent assay and the Western Blot. The tests are performed on a drawn sample of blood.

---

[1] Appellant does not explicitly challenge the statute as applied to the facts of this case.

[2] Even though appellant has been tested, the appeal is not moot because it is capable of repetition, yet evades review. *R. W. Page Corp. v. Lumpkin*, 249 Ga. 576, 578 (1) (292 SE2d 815) (1982). See also *State in Interest of J. G.*, 701 A2d 1260, 1265 (N.J. 1997).

[3] See, e.g., *People v. J. G.*, 655 NYS2d 783 (Sup. 1996); *People v. Adams*, 597 NE2d 574 (Ill. 1992); *Johnetta J. v. Municipal Court*, 267 Cal. Rptr. 666 (Cal. App. 1990). See also Note, AIDS and Rape: The Constitutional Dimensions of Mandatory Testing of Sex Offenders, 76 Cornell L. Rev. 238 (1990).

Used in combination, the tests are considered to be reasonably accurate. However, the tests do not detect the presence of the virus itself; they only detect whether the body has created antibodies in response to the virus. And because these antibodies can take a number of months to develop,[4] a negative test result does not necessarily mean that the individual tested does not have HIV.

## The Legislation

OCGA § 17-10-15 (b) provides:

A victim or the parent or legal guardian of a minor or incompetent victim of a sexual offense as defined in Code Section 31-22-9.1 or other crime which involves significant exposure as defined by subsection (g) of this Code section may request that the agency responsible for prosecuting the alleged offense request that the person arrested for such offense submit to a test for the human immunodeficiency virus and consent to the release of the test results to the victim. If the person so arrested declines to submit to such a test, the judge of the superior court in which the criminal charge is pending, upon a showing of probable cause that the person arrested for the offense committed the alleged crime and that significant exposure occurred, may order the test to be performed in compliance with the rules adopted by the Department of Human Resources. The cost of the test shall be borne by the victim or by the arrested person, in the discretion of the court.

The term "significant exposure" is defined in subsection (g) of Code section 17-10-15 as follows:

contact of the victim's ruptured or broken skin or mucous membranes with the blood or body fluids of the person arrested for such offense, other than tears, saliva, or perspiration, of a magnitude that the Centers for Disease Control have epidemiologically demonstrated can result in transmission of the human immunodeficiency virus.

The purpose behind this legislation is expressed in Ga. L. 1988, p. 1799, § 1:

---

[4] In nearly every case, HIV antibodies will appear within six months of exposure to the virus. See *People v. J. G.*, 655 NYS2d 783, supra.

The General Assembly finds that Acquired Immunodeficiency Syndrome (AIDS) and its causative agent, including Human Immunodeficiency Virus (HIV), pose a great threat to the health, safety and welfare of the people of this state. In the absence of any effective vaccination or treatment for this disease, it threatens almost certain death to all who contract it. The disease is largely transmitted through sexual contacts and intravenous drug use, not through casual contact, and, while deadly, is therefore preventable. The key component of the fight against AIDS is education. Through public education and counseling our citizens can learn how the disease is transmitted and, thus, how to protect themselves and prevent its spread. The Department of Human Resources is encouraged to continue its efforts to educate all Georgians about the disease, its causative agent, and its means of transmission. In addition, voluntary testing should be encouraged for anyone who feels at risk of infection. While education, counseling, and voluntary testing are vital to the elimination of this epidemic, other measures are needed to protect the health of our citizens, and it is the intention of the General Assembly to enact such measures in the exercise of its police powers in order to deal with AIDS and HIV infection.

## *Discussion*

1. Appellant asserts that OCGA § 17-10-15 (b) violates the Fourth Amendment. Of course, an intrusion into the body for the taking and sampling of blood constitutes a search and seizure under the Fourth Amendment. *Skinner v. Railway Labor Executives' Assn.*, 489 U. S. 602, 616 (109 SC 1402, 103 LE2d 639) (1989). However, the Fourth Amendment does not ban all searches and seizures — only those deemed to be unreasonable. Id. What is reasonable " 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' " Id. at 619.

In the criminal context, we measure the reasonableness of a search with a "probable cause" yardstick. However, a probable cause analysis is impracticable when it comes to cases involving special governmental needs, i.e., cases which exceed the ordinary needs of law enforcement. Id. In cases of that kind, a warrant and individualized suspicion may be unnecessary. This is such a case. *State in Interest of J. G.*, 701 A2d 1260, 1266 (N.J. 1997); *Fosman v. State*, 664 S2d 1163, 1165 (Fla. App. 1995).

In "special needs" cases, we must balance the government's need to search against the invasion occasioned by the search. And the

search will be deemed reasonable if the government's interest can be said to outweigh the interest of the individual. *Skinner,* 489 U. S. at 619, supra; *People v. Adams,* 597 NE2d 574 (Ill. 1992).

The government's interest in adopting laws designed to stem the AIDS epidemic is certainly compelling. As the Supreme Court of Illinois observed with regard to that state's HIV testing statute:

> The challenged statute concerns matters lying at the heart of the State's police power. There are few, if any, interests more essential to a stable society than the health and safety of its members. Toward that end, the State has a compelling interest in protecting and promoting public health and, here, in adopting measures reasonably designed to prevent the spread of AIDS. . . . Once persons who are carriers of the virus have been identified, the victims of their conduct and the offenders themselves can receive necessary treatment, and, moreover, can adjust their conduct so that other members of the public do not also become exposed to HIV. In this way, the spread of AIDS through the community at large can be slowed, if not halted. We believe that the HIV testing requirement advances a special governmental need.

*People v. Adams,* supra at 580-581.

The intrusion occasioned by the search is minimal. Blood tests are performed routinely and safely "in our everyday life." *Breithaupt v. Abram,* 352 U. S. 432, 436 (77 SC 408, 1 LE2d 448) (1957). They are not "brutal," "offensive," or "shock[ing to] the conscience." Id. at 435. And they pose no threat to the safety or health of the person tested. In short, they are a minor annoyance.

Balancing the government's need to search against the intrusion occasioned by the search, we conclude that the government's interest outweighs the interest of the individual, and that, therefore, the search is reasonable: The testing procedure prescribed by `OCGA § 17-10-15 (b) is civil, not criminal, in nature. Its manifest purpose is to control the spread of AIDS. Toward that end, the statute provides that the victim of a crime in which there is probable cause to believe that there was significant exposure to HIV can learn whether the person arrested for that crime is carrying the virus. The results cannot be used against the defendant in any criminal proceeding arising out of the alleged offense. OCGA § 17-10-15 (h). Moreover, the test results are disclosed only to the victim, public health authorities, the court which ordered the test, and the penal institution in which the defendant is confined. OCGA § 17-10-15 (f).

Appellant argues that mandatory testing of the person arrested does not advance a compelling state interest because, in light of the

"window period" between contracting the virus and producing antibodies against the virus, a negative result does not necessarily mean that the person is not infected with HIV. Continuing the argument, appellant posits that the fact that the person arrested tested negative could have no effect on the victim's peace of mind or health care decisions because, in the final analysis, the victim will have to be tested to be sure of his status. We disagree.

> The experts believe test results from the potential source of infection, while not dispositive, provide some useful information. If the results are negative, the chances of HIV infection are believed to be smaller, and a negative result will diminish the [victim's] anxiety, a factor pertinent to treatment. The experts suggest that a [victim] would be well advised to have a blood test for clearer information, but HIV antibodies generally would not develop for three to six months after [infection]. [The statute] provides a prompt mechanism to obtain some information pertinent to the [victim's] health and therefore to the governmental special need. The fact that the test of the assailant's blood would not be conclusive does not defeat the [governmental] interest.

*Johnetta J. v. Municipal Court*, 267 Cal. Rptr. 666, 681-682 (Cal. App. 1990). See also *State in the Interest of J. G.*, supra at 1270 (medical experts believe that testing offender for HIV gives victim significant psychological benefits).

2. Pointing out that blood tests and the nonconsensual disclosure of HIV status infringe on privacy interests, see *Skinner*, supra at 616, appellant asserts that OCGA § 17-10-15 (b) is unconstitutional because it violates his right of privacy under the due process clause of the Fourteenth Amendment. In this context, appellant argues that the statute does not serve a compelling state interest and was not narrowly drawn to accomplish its goal through the least intrusive means.

As noted above, OCGA § 17-10-15 (b) does serve a compelling state interest — preventing members of the public from exposure to HIV. *Fosman v. State*, supra at 1166. Moreover, "the statute does accomplish its objective through the least intrusive means, since blood tests are routine, and disclosure of the results is limited to the victim and public health authorities [and prison officials]." Id.

3. OCGA § 17-10-15 (b) does not violate state and federal equal protection clauses. The statute does not infringe upon the exercise of fundamental rights or act upon a suspect class; and classification on the basis of sexual offenses, or offenses where there is probable cause of significant exposure to HIV, bears a rational relationship to the

government interest of preventing the spread of HIV. *People v. Adams*, supra at 585, 586. See also *Benton v. State*, 265 Ga. 648, 649 (3) (461 SE2d 202) (1995).

## Conclusion

OCGA § 17-10-15 (b) does not violate the Fourth Amendment, the right of privacy under the due process clause of the Fourteenth Amendment, or the equal protection clauses of the State and Federal Constitutions.

*Judgment affirmed. All the Justices concur, except Sears, J., who concurs specially.*

SEARS, Justice, concurring specially.

I believe that the compelling governmental interests served by OCGA § 17-10-15 justify the intrusion into individual privacy rights[5] that results from compelled blood testing for the presence of HIV, so long as there is probable cause to believe that the victim of a crime was significantly exposed to a perpetrator's blood or other bodily fluid to the degree that the Centers for Disease Control have determined that transmission of HIV could have occurred. Therefore, I concur in the majority's ultimate conclusion regarding the constitutionality of the statute.

I write separately, however, to emphasize that the facts of this case failed to establish probable cause to believe that "significant exposure," as statutorily defined, occurred during the struggle between Detective Woods and appellant Adams. Thus, the superior court was not authorized under OCGA § 17-10-15 to compel Adams's submission to an HIV test, and the court's order that Adams be tested was erroneous. Because Adams has already been forced to submit to an HIV blood test, any challenge to the superior court's probable cause determination in this case is moot. However, the court's compelling of an HIV test, despite the lack of probable cause, highlights inherent dangers that lurk in OCGA § 17-10-15, and the potential for gross abuse of the statute.

When Detective Woods attempted to arrest Adams, a struggle ensued between them. Detective Woods testified that at the time of the struggle, he noticed that Adams's hand was bandaged. Detective Woods did not know whether Adams actually was bleeding, because "it [the struggle] happened real fast," but he thought that there "appear[ed] to [be] some blood coming through the bandage or on top of the bandage." During the struggle, Detective Woods received a

---

[5] See *Skinner v. Railway Labor Executives Assn.*, 489 U. S. 602 (109 SC 1402, 103 LE2d 639) (1989).

scratch on his thumb and index finger.

When asked whether blood-to-blood contact occurred during the struggle, Detective Woods testified that, "It possibly could. I mean when you're fighting somebody. If I told you it did [occur], I'd be lying, because I don't want to lie to anybody. . . . It could have. It could have mixed together. There's a possibility there."

OCGA § 17-10-15 (b) authorizes the superior court to compel one accused of a crime to submit to an HIV test, "upon a showing of probable cause . . . that significant exposure occurred." "Significant exposure" occurs when there is "contact of the victim's ruptured or broken skin . . . with the blood or body fluids of the person arrested . . . of a magnitude that the [CDC] have epidemiologically demonstrated can result in transmission of [HIV]."[6]

Under the facts discussed above, there was not a showing of probable cause that, when Detective Woods struggled with Adams, "significant exposure" occurred. It is established that a determination of probable cause must be made based upon common sense and practicality.[7] In this case, Detective Woods testified that (1) he saw that Adams was wearing a bandage; (2) he thought he might have seen blood on the bandage; and (3) in his opinion, it was "possible" that blood-to-blood contact occurred between him and Adams. However, Detective Woods admitted that he could not say that such contact did in fact occur. Based upon that testimony, it was unreasonable for the superior court to conclude that there was a reasonable probability that significant blood-to-blood exposure, sufficient to transmit HIV, took place. In fact, in reaching that conclusion, the superior court defied both common sense and the commonly understood facts regarding the transmission of HIV.

What Detective Woods's testimony did establish was that there was a *chance* that there was blood-to-blood contact in his struggle with Adams. However, when dealing with physical intrusions into the body to collect blood samples, the Fourth Amendment's protection against unreasonable searches "forbid[s] any such intrusions on the mere chance that . . . evidence might be obtained."[8] Unfortunately, that is exactly what occurred in this case. On the mere chance that there had been blood-to-blood contact, and assuming that if it occurred, that contact was sufficient to transmit HIV, the superior court ordered that Adams's blood be withdrawn and tested. That action, I believe, was unreasonable under the Fourth Amendment, and improper under OCGA § 17-10-15.

Because the compelled HIV test has already been performed on

[6] OCGA § 17-10-15 (g).
[7] See *Ornelas v. United States*, 517 U. S. 690 (116 SC 1657, 1661, 134 LE2d 911) (1996).
[8] *Schmerber v. California*, 384 U. S. 757, 769-770 (86 SC 1826, 16 LE2d 908) (1966).

Adams, challenges to the superior court's finding of probable cause in this case are moot. Nonetheless, the superior court's probable cause finding highlights an ominous danger inherent in OCGA § 17-10-15. Decades into the struggle against HIV, there is a preponderance of ignorance regarding how and under what circumstances the virus is transmitted. Permitting the superior courts to force one accused of a crime to submit to an HIV blood test upon anything less than a showing that, *based upon medical and scientific knowledge*, there was a significant risk of HIV exposure during commission of the crime can only perpetuate that ignorance. OCGA § 17-10-15 does not sanction the testing for HIV of suspects who, like Adams, merely are bandaged or cut at the time of arrest. Rather, the statute requires that before ordering an accused to be tested for HIV, a superior court must be satisfied that probable cause exists to believe that exposure occurred to the degree "that the Centers for Disease Control have epidemiologically demonstrated can result in the transmission of [HIV]" to the crime victim. Accordingly, the statute mandates that before compelling an accused to sit for an HIV blood test, the judges of the superior courts must educate themselves (with the assistance of counsel) as to the medically-recognized facts regarding the virus's transmission, and satisfy themselves of a reasonable probability that those facts exist in the case before them.

Otherwise, the superior courts will be authorized to compel the physical intrusion of an accused based upon nothing more than ignorance and hyperbole. In addition to being unauthorized under the statute, that situation would foster the statute's rife abuse by individuals who would harass those accused of a crime. For these reasons, I emphasize that the superior court judges must view the statute's probable cause requirements in the strictest sense, and satisfy themselves that those requirements have been met before compelling an HIV blood test under OCGA § 17-10-15.

DECIDED MAY 4, 1998.

*John D. Staggs, Jr.,* for appellant.
*Richard E. Currie, District Attorney, Theo M. Sereebutra, Assistant District Attorney,* for appellee.