151 P.3d 717

**In the Matter of The GUARDIANSHIP OF Edith M. CARLSMITH, Incapacitated Person.**

No. 27569.

Supreme Court of Hawai'i.

Jan. 25, 2007.

Howard Glickstein, on the motion, Honolulu, for Respondent–Appellant, Edith M. Carlsmith.

Stuart M. Cowan, on the joinder, for Respondent–Appellant, C. Duane Carlsmith.

Jeffrey S. Portnoy, Rhonda L. Griswold, and Allison Mizuo Lee (Cades Schutte), in opposition, Honolulu, for Petitioner–Appellee, Cynthia Carlsmith–Crespi.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

1. Hawai'i Rules of Appellate Procedure (HRAP) Rule 40(b) (2005) provides in pertinent part that a motion for reconsideration "shall state with particularity the points of law or fact that the moving party contends the court has overlooked or misapprehended, together with a brief argument on the points raised."

2. HRAP Rule 40(c) provides that, "[n]o response to a motion for reconsideration or reply to a response will be received unless requested by the appellate court."

3. HFCR Rule 65(b) entitled "Restraining order; notice; hearing; duration," states as follows:

A restraining order may be granted without notice to the adverse party when it clearly appears from specific facts shown by affidavit or by the verified complaint or cross-complaint that *immediate relief to the applicant is appropriate.* Every restraining order granted without notice shall be filed forthwith in the clerk's office and entered of record, *shall be accompanied by an appropriate application for further*

MOTION FOR RECONSIDERATION

Opinion of the Court by ACOBA, J.

Respondent–Appellant Edith M. Carlsmith (Edith) filed a motion for reconsideration [1] (the motion) on October 30, 2006, which Respondent–Appellant Duane C. Carlsmith (Duane) [collectively, Respondents] subsequently joined, of this court's October 18, 2006 opinion (the opinion) wherein the September 26, 2005 order of the family court of the first circuit (the court) granting in part and denying in part the motion for attorney's fees and sanctions filed by Petitioner–Appellee Cynthia Carlsmith–Crespi (Cynthia), and the court's September 26, 2005 judgment, were affirmed and the case remanded for further proceedings. *In re Guardianship of Carlsmith,* No. 27569, 113 Hawai'i 211, 151 P.3d 692, 2006 WL 2981430 (Haw. Oct.18, 2006). We ordered that a response to the motion be filed pursuant to Hawai'i Rule of Appellate Procedure (HRAP) Rule 40(c) (2005),[2] and Cynthia filed a response on November 16, 2006.

## I.

In the motion, Respondents argue that they (1) "properly raised, properly preserved, and properly presented [their] argument[s] that Hawai'i Family Court Rule (HFCR) [Rule] 65 [3] violates the due process c[l]ause of the Hawai'i Constitution"; and (2) that "Hawai'i Revised Statute (HRS) [§ ]560:5–101 [ (1993) [4]] purporting to define

*relief and notice of hearing, and shall be served forthwith upon any party or parties affected by the order.* It shall continue in effect until further order of the court. *On 2 days notice to the party who obtained the restraining order without notice, or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move for dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.* (Emphases added.)

4. HRS § 560:5–101(2) defined an "incapacitated person" as follows:

[A]ny person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) *to the extent that the person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning one's person*[.] (Emphasis added.)

'incapacitated person' is unconstitutionally vague, overly broad, and not sufficiently definite," thus "creating ... arbitrary subjective and non-uniform discretion, in violation of [Edith's] rights to due process of law and the equal protection of the laws under both the Hawai'i and United States Constitutions." For the reasons herein, we discuss the claims raised but deny the motion for reconsideration inasmuch as we conclude the claims are not sustainable.

## II.

As to Edith's contentions that she properly preserved her constitutional claims, Edith stated in the conclusion to her reply brief that:

> This court does not have to reach the unconstitutionality of HFCR or [HRS § 560:5–101] to 1. Vacate the judgment; 2. Declare void ab initio the Family Court's Temporary Restraining Order of October 24, 2003, and all subsequent findings, orders, and sanctions; 3. Order the Family Court to dismiss the Petition for Appointment of Guardian of the Person; and 4. Award Appellants their attorneys' fees and costs.

The above statement could have been interpreted as a waiver of Edith's arguments regarding the constitutionality of HFCR 65 and HRS § 560:5–101. *See In re Guardianship of Carlsmith*, at 221, 151 P.3d at 702, 2006 WL 2981430 at *8 n. 15. Although the statement is somewhat ambiguous, on reconsideration it appears that Edith did not intend to waive her constitutional claims. Accordingly, we address the constitutionality of HFCR Rule 65 and HRS § 560:5–101 here.

## III.

■ "This court reviews questions of constitutional law *de novo*, under the 'right/wrong' standard and, thus, exercises its own independent constitutional judgment based on the facts of the case." *State ex rel. Anzai v. City & County of Honolulu*, 99 Hawai'i 508, 515, 57 P.3d 433, 440 (2002) (citing *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted)). This court, as a general matter, has long adhered to the proposition that "(1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." *Child Support Enforcement Agency v. Doe*, 109 Hawai'i 240, 246, 125 P.3d 461, 467 (2005) (internal quotation marks and citations omitted).

## IV.

Respondents' first position is that HFCR Rule 65 "violat[es] ... the due process clause[, article I, section 5 of the Hawai'i Constitution], [because] it creates subjective standardless discretion authorizing drastic relief without notice, without any of the constitutionally necessary procedural safeguards" and is thus (1) "unconstitutional on its face" and (2) unconstitutional "as applied in this case."

## V.

■ With respect to due process, both the Fourteenth Amendment to the United States Constitution and article 1, section 5 of the Hawai'i State Constitution guarantee, *inter alia*, that "no person shall be deprived of life, liberty, or property without the due process of law." "At its core, procedural due process of law requires *notice and an opportunity to be heard at a meaningful time and in a meaningful manner* before governmental deprivation of a significant liberty interest." *State v. Bani*, 97 Hawai'i 285, 293, 36 P.3d 1255, 1263 (2001) (citing *Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 243, 953 P.2d 1315, 1341 (1998); *Price v. Zoning Bd. of Appeals*, 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994); *Sandy Beach Def. Fund v. City & County of Honolulu*, 70 Haw. 361, 376, 773 P.2d 250, 260 (1989) (citing *Mathews v. Eldridge*, 424 U.S. 319, 336, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)) (emphasis added)).

However, "the requirements of due process frequently vary with the type of proceeding involved." *Calasa v. Greenwell*, 2 Haw.App. 395, 399, 633 P.2d 553, 556 (1981) (internal quotation marks, brackets, and citation omitted). This court has said that "due

process is flexible and calls for such procedural protections as the particular situation demands." *State v. Guidry*, 105 Hawai'i 222, 234, 96 P.3d 242, 254 (2004) (quoting *Bani*, 97 Hawai'i at 296, 36 P.3d at 1266) (citations omitted)) (internal quotation marks omitted) (brackets in original). It was made clear in *In re Herrick*, 82 Hawai'i 329, 922 P.2d 942 (1996), that a due process challenge will fail where the following standard is met:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is *notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.*

*Id.* at 343, 922 P.2d at 956 (citation omitted) (emphasis added); *see also, Calasa*, 2 Haw. App. at 399, 633 P.2d at 556 (quoting *Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

## VI.

█ HFCR Rule 65(b) allows for the issuance of an ex parte TRO without notice to the adverse party "when it clearly appears from specific facts ... that immediate relief to the applicant is appropriate." Generally " '[a] TRO is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction.' " *Wahba, LLC v. USRP (Don), LLC*, 106 Hawai'i 466, 472, 106 P.3d 1109, 1115 (2005) (quoting *Whitman v. Hawaiian Tug & Barge Corp.*, 27 F.Supp.2d 1225, 1228 (D.Haw.1998)) (brackets and other citations omitted). In various harassment and abuse contexts, the issuance of an ex parte TRO

has been held proper and not violative of constitutional rights. *See, e.g., Luat v. Cacho*, 92 Hawai'i 330, 346, 991 P.2d 840, 856 (App.1999) (stating that a "TRO, in view of its emergency remedial nature, may be granted *ex parte* "); *Kie v. McMahel*, 91 Hawai'i 438, 441, 984 P.2d 1264, 1267 (App. 1999) (examining a statute allowing for an ex parte TRO to issue upon showing of "probable cause to believe that a recent past act or acts of abuse have occurred, or that threats of abuse make it probable that acts of abuse may be imminent"); *Coyle v. Compton*, 85 Hawai'i 197, 940 P.2d 404 (App.1997) (upholding issuance of an ex parte TRO in a domestic abuse situation).

## VII.

In regard to contention (1), Respondents specifically maintain that (a) "[o]n its face, HFCR [Rule] 65(b) requires only a showing that 'immediate relief to the applicant is appropriate' " and that "[t]here is no requirement of a showing that 'immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition,' " (b) nor is there a "requirement of a certification of efforts made to give notice or the reasons supporting the claim that notice should not be required," and (c) "unlike [Hawai'i Rules of Civil Procedure (HRCP) Rule] 65(b) which limits the duration of a TRO to 10 days, the Family Court TRO is open-ended, and extends until 'further order of the court.' " All of the language Respondents point to is quoted from HRCP Rule 65(b) (2005)[5] and, thus, it appears Respondents

---

5. HRCP Rule 65(b) requires:

> Temporary Restraining Order; Notice; Hearing; Duration. *A temporary restraining order may be granted* without written or oral notice to the adverse party or that party's attorney *only if (1)* it clearly appears from specific facts shown by affidavit or by the verified complaint that *immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.* Every temporary restraining order granted without no-

tice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice and *shall expire by its terms within such time after entry, not to exceed 10 days*, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of

contend that unless the same or similar procedural safeguards present in HRCP Rule 65(b) are contained in HFCR Rule 65, HFCR Rule 65 is unconstitutional.[6]

## VIII.

■ Respondents provide no authority for the proposition that the same safeguards present in HRCP Rule 65 must be read into HFCR 65 and there is no merit in condemning HFCR 65 as unconstitutional merely because that rule employs different language. For, " '[d]ue process is not a fixed concept requiring a specific procedural course in every situation.' " *Guidry,* 105 Hawai'i at 234, 96 P.3d at 254 (quoting *Bani,* 97 Hawai'i at 296, 36 P.3d at 1266). Moreover, HRCP 81(a)(4) expressly provides that "these rules shall not apply to . . . [p]roceedings in the family court[.]" *See In re Protection of the Property of Jaffarian,* 72 Haw. 154, 155, 808 P.2d 1277, 1279 (1991) (noting that "[p]roceedings under HRS [c]hapter 560 are specifically exempted from the operation of the [HRCP] by . . . HRCP [Rule] 81(a)(1)").

■ Although it is not necessary that HFCR 65 provide identical safeguards as HRCP 65, HFCR 65 must nevertheless comport with due process which requires at its most fundamental level, "notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant liberty interest." *Bani,* 97 Hawai'i at 293, 36 P.3d at 1263 (citations omitted).

In regard to Respondents' contention (a), HFCR Rule 65 only allows a restraining order to issue without notice if "it *clearly* appears from *specific* facts shown . . . that *immediate* relief to the applicant is appropriate." (Emphases added) The immediacy requirement speaks to the exigent nature of the TRO. The applicant must present facts that are specific and that make "clear" the need for relief that must be "immediately" granted. Respondents' argument that there should be an express requirement of showing "immediate and irreparable injury, loss, or damage will result" as set forth in HRCP Rule 65(b) is not persuasive.

In HFCR Rule 65(b), the court's discretion is guided by statutory directives indicating that the court may issue a TRO only based on "specific facts" that would make the request for speedy relief proper. HFCR Rule 65(b) is comparable to HRCP Rule 65(b) inasmuch as applicants are required to make a specific showing justifying the restraint requested in the proposed TRO. This is confirmed by HFCR Rule 65(d) which states in pertinent part that "[e]very restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained[.]" HFCR Rule 65(b) thus contains sufficient direction for the court to guide it in issuing TROs.

In regard to contention (b), as noted above, "TRO[s], in view of [their] emergency remedial nature, may [constitutionally] be granted *ex parte*[.]" *Luat,* 92 Hawai'i at 346, 991 P.2d

---

all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained a temporary restraining order shall proceed with the application for a preliminary injunction and, if that party does not do so, the court shall dissolve the temporary restraining order. On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.
(Emphases added.)

6. Cynthia contends that (1) "[Respondents'] assertion that the identical safeguards of [HRCP Rule 65] must be read into [HFCR 65] is without

merit" because "the differences in the language of the Hawai'i Rules of Civil Procedure and the Hawai'i Family Court Rules were approved by this court" and "this [c]ourt specifically exempted the application of the Hawai'i Rules of Civil Procedure to family court proceedings"; (2) "[HFCR Rule 65] . . . most definitely satisfies the constitutional due process requirements" because "[Edith] received notice of the pendency of the TRO and guardianship proceedings because she appeared at the hearing before the family court with her attorney" and "[Edith] and her attorney had an opportunity to present their objections to the TRO and [g]uardianship [p]etition[s]"; and (3) "Hawaii's [a]ppellate [c]ourts have made clear that issuance of an ex parte TRO is constitutional and does not infringe upon constitutional rights."

at 856. HFCR Rule 65(b) directs that "[e]very [TRO] granted ... shall be served forthwith upon any party or parties effected by the order." Thus, the party affected is entitled to notice as soon as the TRO is issued. Further, although HFCR Rule 65(b) does not specifically state that a certification of efforts "made to give the notice and the reasons supporting the claim that notice should not be required" be present, HRCP Rule 65(b), HFCR Rule 65 authorizes the granting of a TRO "without notice to the adverse party" on the condition that the "specific facts" shown in the affidavit or sworn pleading "clearly" indicate "immediate relief ... is appropriate." This is analogous to the showing necessary for supporting issuance of a TRO without prior notice to the adverse party in HRCP Rule 65(b). Because, all that due process requires is "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections[,]" *In re Herrick,* 82 Hawai'i at 343, 922 P.2d at 956 (citation omitted), this portion of the rule comports with due process.

In regard to contention (c), although the TROs issued under HFCR Rule 65 are not expressly limited in duration, under that rule, the adverse party may apply to terminate the TRO "[o]n 2 days notice to the party who obtained the [TRO] ... *or on such shorter notice to that party as the court may prescribe* [.]" (Emphasis added.) The party restrained may then "appear and move for ... dissolution or modification" of the TRO. *Id.* In the event that a party does seek to dissolve or modify the TRO, the court is required to "proceed to hear and determine such motion as *expeditiously* as the ends of justice require." *Id.* (emphasis added). Such a requirement expressly preserves the "opportunity to be heard" promptly after the TRO is issued. In view of the foregoing, HFCR Rule 65(b) is not "open-ended," but subject to time constraints as may be imposed appropriately by the court at the behest of a party. In sum, because "due process is flexible and calls for such procedural protections as the particular situation demands[,]" *Guidry,* 105 Hawai'i at 234, 96 P.3d at 254, and HFCR Rule 65 "afford[s] a

reasonable time for those interested to make their appearance[,]" *In re Herrick,* 82 Hawai'i at 343, 922 P.2d at 956, the rule on its face satisfies the constitutional requirements.

## IX.

Respondents' next contention is that HFCR Rule 65 is unconstitutional "as applied" in this case. In support of this claim Respondents argue that "the court extended the October 2, 2003 TRO depriving [Edith] of her liberty for [more than] two years." Insofar as the TRO involved an order aimed at restricting her movement, there was no unconstitutional application of HFCR Rule 65.

In this case, Cynthia filed an ex parte petition for a TRO and appointment of a guardian ad litem (GAL) for Edith on October 22, 2003, pursuant to HFCR 65 and HRS § 560:5–303 (1993). In that petition, Cynthia alleged that Duane was physically or mentally abusing Edith and that he planned to take Edith to his home in Panama. Two days later, on October 24, 2003, the court granted the TRO and GAL petitions. The TRO was based on "the TRO Petition, ... the affidavits of Cynthia ... and others, and the opinion of Dr. Blanchette, and pursuant to [HFCR] Rule 65(b)." *In re Guardianship of Carlsmith,* at 229, 151 P.3d at 711, 2006 WL 2981430 at *3.

Within four days of the issuance of the TRO, on October 28, 2003, Edith had an opportunity to make objections and to present evidence before the court. Edith appeared at the October 28, 2003 hearing accompanied by her attorney. As the opinion noted, "any objections by Respondents as to the lack of notice [were] deemed waived by Edith's appearance, her failure to object to the purported defect of notice or summons, and insistence upon proceeding with an evidentiary hearing." *In re Guardianship of Carlsmith,* at 225, 151 P.3d at 706, 2006 WL 2981430 at *13. Prior to proceeding with the hearing, the court questioned Edith to confirm that she had received a copy of the TRO and GAL petitions. Edith's counsel indicated that he had read both petitions to her because she was legally blind. Thus, it appears that Edith had both "notice" and the

"opportunity to present [her] objections" at the hearing before the court determined the TRO should be continued. *See In re Herrick*, 82 Hawai'i at 343, 922 P.2d at 956.

On November 5, 2003, the court heard, *inter alia*, the parties' jurisdictional arguments. After oral arguments, the court ruled that it had jurisdiction over Edith and that jurisdiction was concurrent with the State of California. The court stated that Duane was free to return to Panama, but explained that "[t]he reason I issued a [TRO] that [Edith] not go is to be able to have an independent evaluation of was she competent, was there abuse going on, would there be any abuse within the State of Hawaii while she was here [sic]." *In re Guardianship of Carlsmith*, at 216, 151 P.3d at 697, 2006 WL 2981430 at *4. At the hearing's conclusion, the court indicated that it would be issuing a further written order regarding its concurrent jurisdiction and the logistics for an IME.

On that same day, the temporary GAL submitted his first report in which he concluded that after talking to two of Edith's doctors and her caregivers, Edith was in relatively good mental health but that the caregivers had serious misgivings about Duane and his treatment of Edith. On November 26, 2003, the court entered an order finding that Edith was subject to the jurisdiction of the court and ordered that an IME be performed by a court-appointed physician. The court also amended the TRO stating that "[Edith] shall not leave the United States for the next 90 days. [Edith] may return to her home in San Rafael, California or other United States location so long as she informs the [TGAL] of her travel itinerary and address and telephone number." *In re Guardianship of Carlsmith*, at 217, 151 P.3d at 698, 2006 WL 2981430 at *4. On that same day,

Edith's counsel filed an affidavit stating that Respondents had left Hawai'i and had gone to Panama where they apparently still reside.

Over the course of the proceedings the court extended the TRO seven times because of various events, so that Edith could complete the IME and the court could assess her capacity. The court even granted Duane's motion for a "Competency Examination" of Edith in Panama which would allow her to complete the IME there. According to the court, although the Panamanian doctor attempted to arrange an IME, Edith "did not submit to [it] nor did Duane make [Edith] available for an IME." Edith repeatedly refused to submit to an IME even though, based on the October 28, 2003 hearing testimony, it appeared that Respondents themselves sought to have her mental capacity assessed. Had the IME been completed, the court would have had no reason to renew the TRO. Because Edith apparently left the country, an IME was never conducted. As noted above, a "[TRO] is designed to preserve the status quo until there is an opportunity to hold a hearing[,] *Wahba, LLC*, 106 Hawai'i at 472, 106 P.3d at 1115, and here the status quo was to ensure Edith's capacity could be properly assessed. Respondents simply failed to complete the IME.

Based on the foregoing circumstances, HFCR Rule 65 did not violate due process as applied in this case. It appears that Respondents had ample notice of the pendency of the proceedings and numerous opportunities to be heard and to resolve the TRO.

### X.

Respondents' second position is that "[HRS] § 560:5–101 purporting to define 'incapacitated person,' " is (1) unconstitutionally vague, and (2) overly broad.[7] In support of

---

7. Cynthia argues that (1) "[Respondents] fail to cite any applicable case law to support their position and ... cannot satisfy their legal burden of proving that this provision is unconstitutional" because "[u]nder Hawai'i case law, [HRS] § 560:5–101 is presumptively constitutional" and "[Respondents] have the burden of establishing beyond a reasonable doubt that the due process violation resulting from the application of § 560:5–101 is clear, manifest and unmistakable"; (2) Respondents' reliance on the student

law review note is "misplaced" because it "failed to cite any case that held this particular Illinois guardianship statute unconstitutional" and did not "provide examples in which the application of this language violated due process"; (3) "*Colyar* is inapposite" because "its finding was made in the context of evaluating treatment choices for a mentally ill person" who "could be involuntarily committed in a hospital for an indefinite period merely because the mentally ill person elected one medically valid treatment over another";

these claims, they argue that HRS § 560:5–101 is not sufficiently definite creating "an arbitrary, subjective and non-uniform discretion, in violation of Edith's constitutional rights to due process and equal protection of the laws under both the Hawaii and United States Constitutions." Apparently Respondents' specific argument is that "[HRS § 560:5–101] permits a finding of incapacity and result[s in a] loss of personal autonomy based only on the finding that the person is unable to make 'responsible' decisions, without explaining what 'responsible' means."

Respondents rely on a student law review note [8] and on *Colyar v. Third Judicial District Court for Salt Lake County,* 469 F.Supp. 424 (D.Utah 1979). *Colyar* involved a Utah statute that allowed for the involuntary civil commitment "of an individual who is mentally ill, in need of treatment and who 'lacks sufficient insight to make a Responsible decision as to the need for care and treatment as demonstrated by evidence or inability to follow through with treatment." *Id.* at 432 (quoting Utah Code Ann. § 64–7–36(6)(c)(I) (1953)). The *Colyar* court noted that "[u]nder the parens patriae power a state may commit an individual to a mental hospital even though the individual poses no threat to society" but "[t]he state cannot work such a deprivation, as a matter of substantive due process, without first showing a compelling interest to justify its action" such as "protecting its citizens from harm, whether the source of the harm is from other citizens or from the citizen himself." *Id.* at 429–30 (citations omitted).

and (4) "[HRS chapter 560, Article 5] is based on the Uniform Code" and was "reviewed and commented on by the national conference of commissioners, who are experienced practitioners and commentators in their respective fields of law[,]" and "[t]heir success of approving uniform state laws that comport with constitutional mandates is clear by the paucity of decisions holding the uniform code provisions unconstitutional."

8. *See* Mark D. Andrews, Note, *The Elderly in Guardianship: A Crisis of Constitutional Proportions,* 5 Elder L.J. 75 (1997). Andrews argues similar language from an Illinois statute should not survive constitutional scrutiny. *Id.* at 108. Andrews further states that "[w]hether 'the capacity to make or communicate responsible decisions' is a 'legally fixed standard' is quite uncertain[, and t]he standard does not give enough guidance or criterion by which to measure one's

In *Colyar,* the court held that "to the extent that the Utah statute allows for the commitment of mentally ill individuals who are not a threat to themselves and/or who are able to make a rational decision as to treatment, it is both overly broad and impermissibly vague." *Id.* at 433.

Respondents quote *Colyar* which states that:

[T]he statute refers to "A responsible decision." This standard is sufficiently vague and overbroad to allow for a great deal of abuse. The use of the word "responsible" focuses the committing authority's attention on the Content of the decision rather than on the ability of the individual to engage in a rational decision-making Process. The word "responsible," being given no further content, lends itself to a completely subjective and, therefore, potentially arbitrary and nonuniform, evaluation of What is decided rather than an objective evaluation of the Method by which the decision is reached.

*Id.* at 432–33. They further cite the *Colyar* court to the effect that, "[t]he statute, as worded, sweeps within the state's power individuals whom the state has no valid parens patriae interest in committing and lends itself to arbitrary and capricious decisions." *Id.* at 433. The State of Hawai'i filed an amicus brief asserting the constitutionality of HRS § 560:5–101 on June 19, 2006. The State (Amicus) only addressed the facial challenges of the statute.[9]

capacity. Nor is the standard 'sufficiently definite.' " *Id.* Andrews concludes that "statutes as vague as that of Illinois do not give the trier of fact any guidance or standards for determining the meaning of the word 'responsible.' " *Id* Andrews draws this conclusion with little analysis and relies, as Respondents do, on *Colyar*

9. Amicus argues that "HRS § 560:5–101 is no unconstitutionally vague or overbroad." It contends that (1) "[Respondents] make no argument regarding the particular unconstitutionality of this definition, but generally quote from a law review article and a distinguishable Utah District Court case for the proposition that the statute's use of the term 'responsible decision' is vague". (2) that HRS § 560:5–101 is not vague because "the court must have found a mental illness, mental deficiency, physical illness or disability

## XI.

We note that HRS § 560:5–101 is distinguishable from the statute addressed in *Colyar* in that it addresses guardianship rather than civil commitment and, thus, does not implicate the same liberty interests. As the *Colyar* court noted, "it must be recognized that involuntary commitment represents a 'massive curtailment of liberties' which, because it may be for an indeterminate period of time, can be a more intrusive use of the state's power than incarceration under the criminal code." 469 F.Supp. at 429 (citation omitted).[10] Unlike the Utah statute, an immediate loss of liberty is not a necessary consequence in applying the definition of "incapacitated person" under HRS § 560:5–101. The TRO merely prohibited Edith from leaving the United States until her capacity could be assessed and did not involve commitment in any way.

## XII.

■ As to Respondents' vagueness claim, this court has held, as Amicus urges, that "[w]hen a statute is not concerned with criminal conduct or first amendment considerations, the court must be fairly lenient in evaluating a claim of vagueness." *In re Gardens at West Maui Vacation Club*, 90 Hawai'i at 343, 978 P.2d at 781 (internal quotation marks and citation omitted). In order "to constitute a deprivation of due process, the civil statute must be so vague and indefinite as really to be no rule or standard at all. To paraphrase, uncertainty [in a] statute is

not enough for it to be unconstitutionally vague; rather, it must be substantially incomprehensible." *Id.* (brackets, internal quotation marks, and citations omitted).

## XIII.

To reiterate, HRS § 560:5–101(2) defined [11] an "incapacitated person" as follows:

[A]ny person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) *to the extent that the person lacks sufficient understanding or· capacity to make or communicate responsible decisions concerning one's person*[.]

(Emphasis added.) [12] Thus, the definition required that a person (1) be mentally or physically "impaired" and (2) lack "sufficient understanding or capacity to make or communicate responsible decisions concerning one's person[.]"

■ Contrary to Respondents' argument, a court could not properly appoint a guardian simply because a person failed to make a "responsible decision." Rather, the court must have found first, that the person was impaired by a "mental illness, mental deficiency, physical illness or disability" etc. Second, the court was mandated to determine whether the incapacity existed to the extent that the person lacked understanding or capacity to make decisions concerning his or her *person*. Hence, the term "responsible" was not simply used in a general sense,

etc., coupled with an insufficient capacity for making responsible decisions about his or her person"; (3) "the legislature adopted this definition [of an incapacitated person] from the Uniform Probate Code (UPC)[,]" *see* 1997 Haw. Sess. L. Act 200, at 372, 438, after " 'intensive review by judges, probate lawyers, and professional fiduciaries,' " Conf. Com. Rep. No. 24–76, in 1976 Senate Journal, at 850; and (4) "[Respondents] have not argued that Hawaii's definition is 'substantially incomprehensible,' vague 'in all that its applications,' or that it does not comport with the legislature's intent under HRS Chapter 560." (Quoting *In re Gardens at West Maui Vacation Club v. County of Maui*, 90 Hawai'i 334, 343, 978 P.2d 772, 781 (1999).).

10. Amicus argues similarly that "Hawaii's statute is markedly different. It is a guardianship

statute, not a civil commitment statute, and so does not implicate the same liberty interests. In light of this interest and because [Respondents] make no other argument, it is difficult to tell what [Respondents'] arguments for vagueness truly boils down to."

11. The statute was amended by Act 161 in 2004 and Respondents do not contend that the present version is unconstitutional.

12. The definition of an incapacitated person was adopted from the UPC in 1976. *See* 1976 Haw. Sess. L. Act 200, at 372, 438. The legislature adopted the UPC definition after review by "judges, probate lawyers, and professional fiduciaries." Conf. Com. Rep. No. 24–76, in 1976 Senate Journal, at 850.

but as applied in the context of decisions affecting "one's [own] person." Additionally, the term "responsible" is not ambiguous and can be easily understood by a person of ordinary intelligence. *Cf. State v. Kam,* 69 Haw. 483, 487, 748 P.2d 372, 375 (1988) (stating that a "statute is vague if a person of ordinary intelligence cannot obtain an adequate description of the prohibited conduct or how to avoid committing illegal acts" (citations omitted)). The word "responsible" is defined as "having the character of a free moral agent" or "capable of determining one's own acts." *Webster's Third New Int'l Dictionary* 1935 (1961). Under these circumstances the court's exercise of discretion was informed by the statute and was reviewable on appeal. Because HRS § 560:5–101 was not "so vague and indefinite as to really be no … standard at all[,]" the statute was not unconstitutionally vague. *In re Gardens at West Maui Vacation Club,* 90 Hawai'i at 343, 978 P.2d 772 at 781 (internal quotation marks and citations omitted). The definition of incapacitated person, then, when read as a whole, sufficiently apprised Edith of the bases on which the court would review the guardianship petition and any ambiguity in the statute did not render it "substantially incomprehensible[,]" *id.,* so as to overcome the "presumpti[ion of] constitutionality." *Child Support Enforcement Agency,* 109 Hawai'i at 246, 125 P.3d at 467.

### XIV.

 As to Respondents' claim that HRS § 560:5–101 is overbroad, " '[t]he doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and precise in its terms, it may sweep so broadly that constitutionally protected conduct is included in its proscriptions.' " *Tause v. State, Dep't of Labor & Indus. Relations,* 113 Hawai'i 1, 28 n. 27, 147 P.3d 785, 811 n. 27 (2006) (quoting *State v. Bui,* 104 Hawai'i 462, 465, 92 P.3d 471, 474 (2004) (internal quotation marks and citations omitted)). Respondents do not identify any constitutionally protected conduct included within the statute's proscriptions. Thus, this argument is not meritorious.

### XV.

As to Respondents' claim that HRS § 560:5–101 also violates Edith's right to equal protection, Respondents make no discernable argument in regard to this claim. This court may "disregard [a] particular contention" if the appellant "makes no discernible argument in support of that position[.]" *Norton v. Admin. Dir. of the Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (citing HRAP Rule 28(b)(7) (2007) ("Points not argued may be deemed waived.")). Thus, Respondents' equal protection claim is deemed waived.

### XVI.

Respondents have not met their burden of showing "unconstitutionality beyond a reasonable doubt," nor have they shown a "constitutional defect that is clear, manifest, and unmistakable"; thus HRS § 560:5–101 retains the "presumpti[on of] constitutionality." *Child Support Enforcement Agency,* 109 Hawai'i at 246, 125 P.3d at 467.

### XVII.

Therefore, based on the foregoing, IT IS HEREBY ORDERED that the motion for reconsideration is denied.

